IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 5:22-cr-40086-TC-2 |
| | ) |
| LEMARK ROBERSON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MOTION TO DISMISS DUE TO PREINDICTMENT DELAY**

LeMark Roberson, through undersigned counsel Paul Hood, respectfully moves the Court for an Order dismissing the case with prejudice pursuant to the Fifth and Sixth Amendments to the Constitution of the United States. Undersigned counsel has conferred with counsel for co-defendants Cecil Brooks and Richard Robinson. The co-defendants join this request.

**SUPPORTING MEMORANDUM**

**1. Nature of the Matter before the Court and Relief Sought**

The Government filed its Indictment on November 10, 2022 charging the defendants with crimes that allegedly occurred twenty-five years earlier. Count 1 alleges a conspiracy in 1996, 1997, and 1998 to deprive young women of their right to be free from involuntary servitude. Counts 2 and 3, respectively, allege willfully holding "Person 1" and "Person 2" in involuntary servitude in that same period. With its Indictment, the United States Government used law adopted after the Civil War and intended to protect newly-emancipated slaves to charge three black men with sexual slavery. The defendants are innocent. By this motion, they respectfully ask this Court to enter an order dismissing the Indictment with prejudice, because the

Government delayed bringing the prosecution by over two decades to gain a tactical advantage over the defendants.

   2.   **Concise Statement of Facts**

The Indictment allegations center on the Delavan Apartments in Kansas City, Kansas. Young women at the Delevan Apartments were allegedly given drugs in exchange for sexual services. ECF Doc. 1 at paragraph t. The defendants allegedly forced Person 2 to provide sexual services to other men for about 4 months. ECF Doc 1 at paragraph x. Mr. Roberson allegedly held Person 1 hostage for over a year at the Delavan Apartments and raped her repeatedly. ECF Doc. 1 at paragraphs g and h. Mr. Brooks and Mr. Roberson allegedly raped Person 2. ECF Doc. 1 at paragraphs dd and y.

Somehow the Defendants were allegedly able to hold Person 1 for a year and Person 2 for four months without anyone noticing their absences and were able to somehow avoid police contact while women were being held captive in rooms with windows. The Government alleges that Mr. Brooks was able to avoid detection by paying off police officers who would then supposedly warn him if police were going to arrive. ECF Doc 1 at paragraph cc. In contrast, the case materials show repeatedly police contact at the Delevan, including repeated instances when Mr. Brooks contacted the police to report crimes, but none of the reports from those police contacts ever mention a young woman banging on a window and calling out to the responding officers for help.

The Government has also provided notice that it will rely on the testimony from other alleged victims, including alleged other victim F. Based on the filings and case disclosures from the Government, it appears that alleged other victim F was not included in the Indictment because the applicable statute of limitation bars a prosecution based on her claims. However, if

alleged other victim F is to be believed, the Government was informed of the allegations against Mr. Brooks over twenty years before bringing the Indictment.

On November 5, 2001, Special Agent Jonathan Tucker of the FBI and Taskforce Officer Jose Viera met with alleged victim F. The details are presented in a report authored by Agent Tucker. Brooks_003119-21. Alleged other victim F informed them that she had lived at the Delavan Apartments and had known Cecil Brooks for fifteen years. She claimed that Mr. Brooks was a drug dealer and that he used her drug addiction to get her to do numerous things. She claimed that he had sexually assaulted her on numerous occasions and that he would sometimes give her drugs in exchange for sex. This is the same location, the same defendant, the same alleged activity, even down to the claim of forced sex and sex for drugs. The Government[1] had knowledge of these allegations in 2001 and brought no charges until 2022, just over 21 years later. As would be expected, that delay has impacted the available evidence that can be presented at trial.

### 3. Legal Authorities

Claims for preindictment delay receive limited protection under the Due Process Clause of the Fifth Amendment. *United States v. Johnson*, 120 F.3d 1107, 1110 (10th Cir. 1997). "Preindictment delay is not a violation of the Due Process Clause unless the defendant shows both that the delay caused actual prejudice and that the government delayed purposefully to gain a tactical advantage." *Id*. "The burden of proof of making this showing is on the defendant."

---

[1] In saying that the "Government" knew of this information, it is useful to examine cases that deal with the question of whether knowledge of favorable information by law enforcement officers can be imputed to a prosecutor (or his or her office) for purposes of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Those cases generally hold that "even if the prosecutor has no 'actual knowledge of the existence of the evidence at issue'… the 'prosecution' includes 'not only the individual prosecutor handling the case, but also . . . the prosecutor's entire office, as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture.'" *McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016). "Accordingly, we impute knowledge of material impeachment evidence to the prosecutor for Brady purposes when that knowledge is in the possession of other 'agents of the prosecution.'" *Id*.

*United States v. Engstrom*, 965 F.2d 836, 839 (10th Cir. 1992); *Perez v. Sullivan*, 793 F.2d 249 (10th Cir. 1986).  "Vague and conclusory allegations of prejudice resulting from the passage of time and the absence of witnesses are insufficient to constitute a showing of actual prejudice. Defendant[s] must show definite and not speculative prejudice, and in what specific manner missing witnesses would have aided the defense."  *United States v. Trammell*, 133 F.3d 1343, 1351 (10th Cir. 1998).

The Tenth Circuit has described the Court's task on claims of preindictment delay as follows:

> The Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment. Judges are not free, in defining due process, to impose on law enforcement officials our personal and private notions of fairness and to disregard the limits that bind judges in their judicial function.  [The Court's] task is more circumscribed.  [The Court is] to determine only whether the actions complained of here, compelling [defendants] to stand trial after the Government delayed indictment to investigate further violates those fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency.

*United States v. Revada*, 574 F.2d 1047, 1048-49 (10th Cir. 1978) (internal citations omitted).

The United States Supreme Court has made clear, however, that deliberate delay for tactical advantage is not the only cause of pre-indictment delay that may violate due process. The Court refused to predict "in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions." *United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 2052 (1977).  The Court's statements "strongly indicate that the Supreme Court is willing to find delay unconstitutional when caused by reasons less invidious than deliberate tactical 'gamesmanship' by the prosecution." *United States v. Richburg*, 478 F.Supp. 535, 543 (M.D. Tenn. 1979) (granting in part Defendants' motion to dismiss indictment for preindictment delay.) One such instance is where there is a showing of "prosecutorial delay incurred in reckless

disregard of circumstances, known to the prosecution, suggesting there existed an appreciable risk that delay would impair the ability to mount an effective defense." *Lovasco*, 431 U.S. at 795, n. 17.

### 4. The Two-Decade Delay Prejudiced the Defendants

A timely prosecution in 2002 or 2003 would have faced two significant problems. The Government knew about the problems at the time and avoided them by waiting.

First, former federal prosecutor Terra Morehead purchased cocaine from Aaron Robinson, a nephew and associate of Cecil Brooks in Mr. Brooks's drug dealing operation. Ms. Morehead is a former Wyandotte County prosecutor and became a federal prosecutor working in Kansas City, Kansas no later than 2002. A witness in this case describes seeing Ms. Morehead purchase cocaine from Aaron Robinson. That witness was interviewed by FBI agents on September 30, 2020. The interview was recorded and has been provided to the defendants. It is labelled by its machine generated file name 1D60(2). At about 1 hour 11 minutes and 57 seconds into the interview, the witness claims to have seen Ms. Morehead receive and ingest cocaine. The witness claims to have seen Aaron Robinson serve Terra Morehead cocaine "hella times." The witness claims to have seen Ms. Morehead "do the cocaine." The witness explains seeing Ms. Morehead buying cocaine at two different locations. Later the witness reiterates, "She was on dope. Terra Morehead was on dope." 1D60(2) at 1:14:42. The witness contends that the authorities have tried "to sweep that under the rug." 1D60(2) at 1:14:48.

As was already noted, by November 5, 2001, the Government was aware of the allegations made by alleged victim F. Had the Government filed an Indictment in 2002 or 2003, it would have faced a profound strategic disadvantage. One of its own prosecutors, a prosecutor in the federal courthouse in Kansas City, Kansas, would have been a witness to the drug

activities of Aaron Robinson, a close associate and relative of Cecil Brooks, and a person mentioned by multiple alleged victims in the discovery in this case. That would have been more than an embarrassment to the Government; it would have undercut the Government's case. The case is premised on the strange notion that multiple young women could be held in an apartment complex for up to a year with no one noticing, not the family members of the missing women, not the residents of the apartment complex, not police who appear at time to time in the apartment complex, no one. Somehow, someway Cecil Brooks and his co-defendants supposedly operated a slavery brothel, and no one noticed. In fact, Cecil Brooks was well known to the authorities. The authorities knew he was a drug dealer. One of the authorities even got cocaine from his operation. Had this case been filed in the early 2000s, the defendants could have called then federal prosecutor Terra Morehead as a witness. She could have admitted that she regularly got cocaine from Cecil Brook's associate and family member, Aaron Robinson, or she could have denied it. If she denied it, the defense could have called the witness interviewed by FBI Agents in the recording at 1D60(2). Either way, a current federal prosecutor would have been testifying for the defense. It seems safe to say that she would have testified that she knew nothing of sexual slavery at the Delavan Apartments, a location that was a few miles from the courthouse where she worked at the time. That testimony and the testimony of the witness who says Ms. Morehead knew Aaron Robinson would support the defense contention that the allegations are a lie. Mr. Brooks was not flying under the radar. He was not invisible. He was drug dealing. He was not operating a slavery ring.

Now, Ms. Morehead is no longer a federal prosecutor. In fact, she has been disbarred. Her credibility as a defense witness is obviously damaged, and she is no longer connected to the Government that has finally decided to bring its case.

Importantly, the details listed in the previous three paragraphs were known to the Government by 2002 at the latest. Agents Tucker and Viera as well as Ms. Morehead were "the Government" at the relevant time. Ms. Morehead knew where she got her cocaine. She knew who Aaron Robinson was, and she knew his connection to Cecil Brooks. The current prosecutors handling the case may argue that they did not know any of this, but their personal knowledge is not the issue. If it were, no motion for preindictment delay would ever succeed because new prosecutors who can honestly say, "I know nothing," could be brought in to handle the case. The issue is not the knowledge of the assigned prosecutors. The issue is the knowledge of the Government. The Government knew what Terra Morehead knew because Terra Morehead was the Government.

The Government gained a second advantage from the two-decade delay. In the 1990s and early 2000s, Mr. Brooks was an informant for the DEA. This point is not disputed by the Government. Assistant United States Attorney Stephen Hunting has confirmed this fact. The Government indexing system confirms that an informant file once existed and that Mr. Brooks was the informant. However, the contents of that file, including the name(s) of the DEA Agent(s) that worked with Mr. Brooks has been lost, destroyed, or simply not retained. Mr. Brooks does not recall the name of the agent or agents that he worked with. The defense has no way to gain that information. Had the case been filed in 2002 or 2003, the file would have still existed. The defense could have called one or more federal agents who had contact with Mr. Brooks at the relevant time. In that instance, the prosecution would have been trying to persuade the jury that, once again, law enforcement was having contact with Mr. Brooks and once again no one noticed the young women being held captive. No one saw them. No one heard rumors. The DEA agent or agents would have testified as to the steps they took to vet Mr. Brooks as an

informant and would have testified regarding their familiarity with him. As with the previous argument, the relevant details were all known to the Government. The Government knew what the DEA Agents knew, and the Government knew its own file retention policy. The Government knew it was gaining an advantage from delay. The prejudice to the Defendants is not vague or conclusory. One or more federal agents were having contact with Mr. Brooks. The testimony of that agent or agents would have directly undercut an essential premise of the Government's case, that Mr. Brooks was somehow invisible to authorities. Undercutting that premise would benefit Mr. Brooks and his codefendants as well. The loss of that information violates the right of the defendants to present a defense under the Due Process Clause of the Fifth Amendment to the United States Constitution and the right of the defendants to call witnesses to testify under the Sixth Amendment. The agent or agents cannot be subpoenaed because their names are unknown.

### 5. The Government Delayed to Gain Advantages over the Defendants

*Lovasco* suggests that intentional tactical delay is not required for the defendants to prevail on this motion, but, even if required, that showing is made here. The Government's purpose for the delay in this case can best be understood in the context of other actions taken by the Government. The Plaintiff (the Government of the United States) had knowledge of weaknesses in this case, and the Government has taken purposeful steps to try to obscure those weaknesses.

For example, FBI Agents in this case conducted dozens of witness interviews. Over one hundred recordings have been produced in the Government's disclosures. Those interviews whether by phone or in person were consistently recorded, with a few important exceptions. The agents chose not to record the statements of Person 1 and Person 2, or, if those statements were recorded, the recordings have never been provided to the defendants.

An audio recording will reveal the tone of a witness's voice and pauses when a witness's mental wheels are turning to come up with a lie or an explanation for a lie that has already been told and must now be defended because it has been challenged. Every witness in this case is rightfully subject to that sort of scrutiny, but the FBI decided that Person 1 and Person 2 are above that. That choice reflects the bias of the Government in this case. It was a necessary bias if the prosecution was to go forward because the statements made by Person 1 and Person 2 are ridiculous and self-contradictory. It is obvious why the agents chose not to record them. The scrutiny would have been unbearable.

For instance, on April 22, 2022, agents interviewed Person 1. No recording has been provided, but the statement was described in a report. Brooks_002737-45. In that report, Person 1 describes her alleged, initial contact with Lemark Roberson. She alleges that he showed up at her workplace one evening and offered her a ride home. She agreed, but, instead of taking her home, he took her to the Delavan Apartment Complex to an office. "The office became her apartment where she was held captive. Once [Person 1] entered the office, she could not leave." She was beaten. She was held there for about a year and only let out with an escort. The agents interviewed Person 1 again on May 11, 2022 and June 13, 2022. Again, no recordings have ever been provided of these interviews. A few months later, the agents interviewed her again on September 23, 2022. Again, no recording, but, apparently, the agents had an opportunity to check on the story told in the earlier interviews, and Person 1 had some explaining to do. Now, Person 1 said that, "In the beginning of her interactions with Mark, [Person 1] considered them to be in a relationship." 194D-KC-3048845 Serial 884 at page 1. She added that, "Some sexual encounters with Mark were consensual, especially in the beginning of their interactions." *Id.* In the prior three interviews, Person 1 had never claimed that she was in a relationship with Mr.

Roberson or that any of their interactions were consensual. Instead, in the earlier statements, she described an abduction, like something out of a movie. He showed up at her workplace one evening, offered her a ride, took her to an apartment she had never been to before, and held her captive. From the moment she got there, she "could not leave." Brooks_002737. In contrast, in September she said, that "When [she] was first taken to Delavan, she felt she could leave if she wanted to."

Reading between the lines, the FBI Agents interviewed her in April, May, and June of 2022. Then they did some other investigating. They learned new details that exposed the falsehoods in Person 1's first three interviews. They confronted her about those details. Perhaps they said things like, "You told us he abducted you to the office at Delavan and beat you and raped you, but we talked to some other people and they told us _____. How do you explain that?" After being confronted with the contrary facts, Person 1 changed the story from an abduction and captivity and rape to being free to go and in a consensual relationship, at least in the beginning. It would have been helpful if the agents had chosen to record the statements so that a listener could hear what caused the changes and what the witness sounded like as she amended her three prior interviews. The agents did not record the interview, and that speaks to the attitude of the Government in this case. Even when the accusations made by Person 1 had been called into question, the FBI would not record her statements, even though they had recorded dozens of other statements. To the Government, all witnesses are equal, but Person 1 and Person 2 are more equal than the others. They must receive special treatment. They are the accusers. To the Government, this was not a balanced investigation in pursuit of truth. This was an investigation in pursuit of convictions. That bias should be kept in mind when we consider the purpose of the Government in delaying the Indictment.

The previous paragraphs addressed problems related to Person 1's false allegations, problems that are fully known to the Government.  There are problems related to Person 2 as well, also fully known to the Government.

On June 22, 1993, when Person 2 was eleven years old, she spent the night with her boyfriend and had sex with him.  She realized her mother would want to know where she had been.  To cover her absence and keep herself and her boyfriend from getting in trouble, she falsely accused a man named Ricky Robinson of kidnapping and raping her.  Police investigated.  The case quickly fell apart.  In a subsequent police interview, Person 2 admitted that the allegations were false and that she had made the false claim to keep herself from getting into trouble.  She even explained why she picked Ricky Robinson to falsely accuse.  She did not like him or his family.

The Government is aware of this prior false allegation by Person 2.  The case materials include the full statement of Person 2 to Police Detective Doug Hansen on June 24, 1993 when Person 2 admitted she lied and explained why she lied.  Golubski_010071-74.  Detective Hansen described the conclusion of the investigation in one of his reports on June 24, 1993, which is also in the case materials.  "Reporting Detective feels this child should be placed in a facility to be evaluated; however, on the authority of Lt. McKinney the child was released to the mother to receive a mental evaluation."  Golubski_009987.  The case materials do not appear to contain the results of that evaluation or the details of any professional help that Person 2 received.

Person 1's claims are self-contradictory.  Person 2 is a self-confessed liar who previously made a false claim of kidnapping and rape for personal gain.  The Government knows its case is weak, and the Government's employees are willing to take steps to make the case stronger.  Delaying the Indictment was one of those steps.  Motive can never be proven by direct evidence.

A motive cannot be extracted from a person's mind and analyzed under a microscope or subjected to a DNA test. Motives must necessarily be inferred. In this instance, the motive is clear. Delay made the case stronger by making one damaging witness less damaging, since she is no longer a prosecutor, and by removing at least one other damaging witness entirely from the case, since the person's name has been lost to time.

The prejudice has been shown and the delay was purposeful and meant to create a tactical advantage. The requirements of *Johnson*, *Engstrom,* and *Trammell* are met in this instance. Moreover, under *Lovasco,* a showing of less than deliberate tactical advantage can be sufficient. This is not a situation of delay by two or three years while investigators worked to collect evidence. This is a delay of twenty-one years. That delay has hampered the ability of the defendants to fight the case. That was the inevitable and foreseeable effect. It was the intended effect. The motion should be granted. The case should be dismissed.

Respectfully submitted,

s/ Paul Hood
PAUL HOOD, KDC # 78960
104 W. 9th Street, Suite 404
Kansas City, MO 64105
Phone: 541-513-7545
Fax: 844-284-3964
paul@paulhoodlaw.com

Attorney for LeMark Roberson

**Certificate of Service**

  In accordance with D. Kan. Rule CR49.9, the undersigned certifies that the foregoing motion was electronically filed on April 11, 2025 and that service was accomplished through Notice of Electronic Filing to counsel for the Government and counsel for co-defendants.

            s/ Paul Hood
            Paul Hood